# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 12-41297

United States Court of Appeals
Fifth Circuit

**FILED**

March 17, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ANDREA C. ANDERSON; NORMAN STAUBYN ANDERSON,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 4:10-CR-194-1

Before JOLLY, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

PER CURIAM:*

Andrea C. Anderson and Norman Staubyn Anderson were indicted on one count of conspiracy to commit wire fraud and eleven counts of wire fraud. A federal jury convicted the Andersons on all counts and the district judge sentenced them to 57 months of imprisonment. The Andersons now appeal their conviction and sentence. We will affirm.

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-41297

## I

### A

On September 8, 2010, a grand jury returned an indictment charging Andrea C. Anderson and Norman Staubyn Anderson on twelve counts. Count One charged the Andersons with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Count Two through Twelve charged the Andersons with wire fraud, in violation of 18 U.S.C. § 1343.[1] The Andersons pled not guilty to these counts.

The Andersons were tried before a jury. When the Government finished its case-in-chief, the Andersons moved for judgment of acquittal in accordance with Federal Rule of Criminal Procedure 29,[2] but that motion was denied. The Andersons presented no witnesses, and the Government presented no rebuttal case. The jury returned verdicts of guilty as to both the Andersons for all twelve counts.

The Andersons were sentenced on November 15, 2012. The district court sentenced each Anderson to 57 months of imprisonment followed by 3 years on supervised release with respect to Counts One through Twelve, to be served concurrently. While the fines were waived, the district court made a special assessment of $1,200 for each Anderson, ordered restitution in the amount of $915,687.63 be paid jointly and severally, and imposed special conditions on supervised release.

### B

Between 2005 and 2009, the Andersons ran a Ponzi scheme that defrauded several victims of their money. As the evidence at trial adduced, the

---

[1] The Andersons were also indicted for 18 U.S.C. § 2, which makes it a crime to aid and abet a crime. However, their final convictions were only for the conspiracy charge and the substantive charges of wire fraud.

[2] Fed. R. Crim. P. 29.

Andersons claimed to potential victims that they were successful investors and wanted to help their families and friends find success in investing. The Andersons would usually tell their victims that Andrea Anderson had a sister, often named Lenore Lawrence, who worked at Goldman Sachs. They also claimed that they had an investment account at Goldman Sachs with a huge sum of money. They claimed that Lenore would be the one purchasing the stocks for which the victims were paying. For example, one victim was informed that he was buying stocks of Rosetta Stone, while another was informed that he was buying the initial public stock offering of VISA. Victims sent their money to the Andersons' personal bank accounts in a variety of ways, including wire transfers, cashier's checks, personal checks, and cash. The Andersons sent the victims emails confirming that the payments had been made, and sometimes even asked for more money so that the Andersons could finish the purported transaction. The Andersons did own a few investing accounts at TD Ameritrade. Some victims did receive some money back from their investment. But usually this was money taken from one victim and given to another; for example, as Special Agent Scott Nicoll of the U.S. Secret Service testified, "[t]he same day, in fact that funds came in from one investor, the money went right back out to another investor." At other times, instead of sending the principal and interest back to the victim as promised, the Andersons would claim that they had reinvested the money because "[n]ow is not the time not to invest."

Victims also got emails that were supposedly from Lenore Lawrence that claimed that the victims' instructions (to sell off stocks and return their money) were being followed. But no one ever met Lawrence or spoke to her on the phone. Some victims demanded their money back repeatedly to no avail. Andrea Anderson responded to some victims by forwarding emails that were supposedly from Goldman Sachs employees, but the evidence showed that

these emails were forgeries. For instance, Andrea Anderson met with Goldman Sachs employees acting as though she wanted to open an account, and they would email her to follow up on their initial meeting. Anderson would proceed to modify these emails and forward them to the victims.

The evidence showed that Goldman Sachs did not employ a "Lenore Lawrence" and that the Andersons did not own an investment account at Goldman Sachs. The evidence also showed that though the Andersons did invest some of the money, they had never made handsome returns on their investments and mostly had losses. The evidence also demonstrated that the Andersons had no other source of income, and that they used the victims' money for personal expenses. Ultimately, 11 victims lost a grand total of $915,687.63.

## C

After a Presentence Investigation Report (PSR) was made available as to both the Andersons, they filed joint objections contending that the loss amount and the number of victims had been wrongly calculated.

First, the PSRs calculated the loss amount as $1,009,712.72. This led to a 16-level increase under U.S.S.G. § 2B1.1(b)(1)(I), which applies if the loss is more than $1,000,000.[3] The Andersons contended that the loss amount was less than $1,000,000, and the Government conceded this point. The Andersons argued that only a 14-level increase should have applied under § 2B1.1(b)(1)(H), which applies if the loss is more than $400,000.[4]

Second, the PSRs calculated the number of victims as 11. This led to a 2-level increase under § 2B1.1(b)(2)(A)(i), which applies if the offense involves 10 or more victims.[5] The Andersons contended that only 9 victims were involved.

---

[3] *See* U.S. Sentencing Guidelines Manual § 2B1.1(b)(1)(I) (2012).

[4] *Id.* § 2B1.1(b)(1)(H).

[5] *Id.* § 2B1.1(b)(2)(A)(i).

No. 12-41297

The Andersons argued that no increase should have been applied.

Revised PSRs issued which took into account these objections. The loss amount was now changed to $915,687.63, leading to a 14-level enhancement under § 2B1.1(b)(1)(H). But the amount of victims was still calculated to be 11, and the 2-level increase under § 2B1.1(b)(2)(A)(i) still applied.

At the sentencing hearing, the Andersons indicated they were satisfied with the resolution of the objection as to the loss amount.[6] However, they renewed their objection as to the amount of victims and the application of § 2B1.1(b)(2)(A)(i). The district court overruled that objection. The district court proceeded to adopt the revised PSRs. The total offense level for each defendant was 23, and both defendants had a criminal history level of I, which yielded a Guidelines range of 46 to 57 months. The Andersons urged a sentence on the lower end, but denied the allegations and did not express remorse. The district court sentenced the Andersons to 57 months of imprisonment followed by 3 years on supervised release with respect to Counts One through Twelve, to be served concurrently, as well as ordering restitution and special assessments.

The Andersons now appeal.

## II

The Andersons first argue that the evidence is insufficient to sustain the jury's verdict of guilty on the twelve counts of conviction.

We review a challenge to the sufficiency of evidence following a proper

---

[6] Andrea Anderson still had some objections as to the way the specific loss amount was calculated for one of the victims (Shamla Naidoo) for purposes of restitution, but clearly conceded that it would not make a difference as to sentencing because the revised PSR already recommended the 14-level increase. In any case, the district court overruled this objection, with the proviso that if some documentation later supported the objection, then it would be reviewed again.

motion for acquittal de novo.[7] "When reviewing the sufficiency of the evidence, we view all evidence, whether circumstantial or direct, in the light most favorable to the government, with all reasonable inferences and credibility choices to be made in support of the jury's verdict."[8] We "must affirm if a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt."[9]

The Andersons were convicted of one count of conspiracy to commit wire fraud under 18 U.S.C. § 1349. To prove a conspiracy to commit wire fraud, the Government had to prove beyond a reasonable doubt that (1) two or more persons made an agreement to commit wire fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, in other words, with the intent to further the unlawful purpose.[10] The agreement may be silent and does not need to be formal or spoken.[11] "An agreement may be inferred from concert of action, voluntary participation may be inferred from a collection of circumstances, and knowledge may be inferred from surrounding circumstances."[12]

The Andersons were also convicted of eleven counts of the substantive crime of wire fraud under 18 U.S.C. § 1343. To prove wire fraud, the Government had to prove beyond a reasonable doubt "(1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme."[13] Additionally, even though not within the language of § 1343,

---

[7] *United States v. Winkler*, 639 F.3d 692, 696 (5th Cir. 2011).

[8] *United States v. Ford*, 558 F.3d 371, 375 (5th Cir. 2009).

[9] *Winkler*, 639 F.3d at 696 (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)).

[10] *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012).

[11] *Id.*

[12] *United States v. Stephens*, 571 F.3d 401, 404 (5th Cir. 2009) (quoting *United States v. Bieganowski*, 313 F.3d 264, 276 (5th Cir. 2002)).

[13] *United States v. Radley*, 632 F.3d 177, 184 (5th Cir. 2011) (quoting *United States v. Ingles*, 445 F.3d 830, 838 (5th Cir. 2006)).

"materiality of falsehood is an element" of the crime.[14] "A material statement has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed."[15] "Violation of the wire-fraud statute requires the specific intent to defraud, i.e., a 'conscious knowing intent to defraud.'"[16]

For the conspiracy conviction, the Andersons assert that there is insufficient evidence as to all the essential elements. However, the Government points to evidence from which a rational trier of fact could have drawn the necessary inferences.

Several victims testified that the Andersons worked in tandem. For example, victim Phillip Douglas was introduced to the Andersons by another victim, his ex-girlfriend Deborah Ford. "She just said [that she was investing with] Andrea and Norman, because they were like one. One person, basically. They were a couple." Victim Rafael Green testified that he was in frequent email contact with Andrea Anderson, then she forwarded him a "Goldman Sachs" email, and he later got repayment from Norman Anderson as promised by the email. Norman Anderson convinced victim Deborah Ford to invest, but the payment instruction were sent by both spouses. Victim Donel Miller communicated with both spouses about the investment: "Norman stopped responding and then Andrea started responding." Victim Don Henrique was in touch with Andrea Anderson, but then Norman Anderson responded when legal action was threatened. Victim Danta Mason talked to both the spouses about the details of the investment.

Not only that but both spouses were making material

---

[14] *Neder v. United States*, 527 U.S. 1, 25 (1999).

[15] *United States v. Valencia*, 600 F.3d 389, 426 (5th Cir. 2010) (citation omitted) (internal quotation marks omitted).

[16] *United States v. Brooks*, 681 F.3d 678, 700 (5th Cir. 2012) (quoting *United States v. Reyes*, 239 F.3d 722, 736 (5th Cir. 2001)).

misrepresentations. Both spouses met with victims Tom Parrish and his wife: "They told us that they . . . had a private family hedge fund with Andrea's sister and her cousin, her sister Lenore and her cousin Joy. That one of them worked for Goldman Sachs, and the other worked for BlackRock in New York City." Both statements were false. The record is replete with similar evidence. Given all this evidence, a rational trier of fact could have found all three elements of conspiracy to commit wire fraud beyond a reasonable doubt.

As to the substantive crime of wire fraud, the Andersons argue there is insufficient evidence to show the specific intent to defraud. However, a rational trier of fact could have found this specific intent beyond a reasonable doubt simply from the fact that the Andersons were lying about their connection to Goldman Sachs, among other things. These lies were intended to get people to invest with them.

The evidence at trial was sufficient to support the Andersons' convictions on all counts.

### III

The Andersons claim that Count One of the indictment should have been dismissed because it fails to state an offense. The Andersons argue that 18 U.S.C. § 1349 is a penalty provision only, and that it is unconstitutional to apply it as a criminal offense because it gives no notice to the public of what constitutes a conspiracy to commit wire fraud.

We review de novo the district court's denial of the Andersons' motion to dismiss the indictment.[17] The district court's factual findings in connection with the ruling are accepted unless clearly erroneous.[18]

Enacted as part of the Sarbanes-Oxley Act of 2002,[19] 18 U.S.C. § 1349

---

[17] *United States v. Villanueva-Diaz*, 634 F.3d 844, 848 (5th Cir. 2011)

[18] *Id.*

[19] Pub. L. No. 107-204, 116 Stat. 745.

No. 12-41297

provides:

> Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.[20]

According to the Andersons the fatal flaw in this language is that it does not contain the requirements of a conspiracy. Looking to 18 U.S.C. § 371,[21] the Andersons complain that § 1349 does not contain the essential elements of an overt act or even conspiratorial agreement between two or more people. The Government responds by explaining that § 1349 parallels 21 U.S.C. § 846, a freestanding drug conspiracy offense. The two provisions are almost identical. Section 846 provides:

> Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.[22]

Like § 1349, § 846 also lacks an overt act requirement. But the Supreme Court has held that there is no constitutional problem with the lack of an overt act

---

[20] 18 U.S.C. § 1349.

[21] 18 U.S.C. § 371 provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.
>
> If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

18 U.S.C. § 371.

[22] 21 U.S.C. § 846.

requirement in § 846, and has upheld convictions under that provision.[23] The Supreme Court has similarly found other conspiracy statutes lacking an overt act requirement constitutional.[24] Similarly, we have clarified that § 1349 indeed does not contain an overt act requirement, and have refused to dismiss an indictment where the defendant was arguing that being charged under both §§ 1349 and 371 violated the prohibition on multiplicity.[25]

That § 1349 does not contain an explicitly stated requirement of two or more persons agreeing should not be problematic given that § 846 and similar conspiracy statutes also do not have this language. Finally, the fact that "attempts" and "conspires" are undefined is not a problem because even the Andersons' prime example, § 371, does not define "conspire."

The Andersons' contention that § 1349 is penalty provision because of the circumstances of its legislative birth is also unpersuasive. Section 1349 was originally in Title IX of the Sarbanes-Oxley Act of 2002,[26] which was entitled "White-Collar Crime Penalty Enhancements."[27] However, as the Supreme Court has previously clarified, the heading of a statute is only helpful if there is some doubt about the meaning of the statute.[28] Here, this is no ambiguity.

---

[23] *United States v. Shabani*, 513 U.S. 10, 15 (1994) ("What the Ninth Circuit failed to recognize we now make explicit: In order to establish a violation of 21 U.S.C. § 846, the Government need not prove the commission of any overt acts in furtherance of the conspiracy.").

[24] *See Whitfield v. United States*, 543 U.S. 209, 214 (2005) (upholding money laundering conspiracy provision despite lack of overt act requirement); *Salinas v. United States*, 522 U.S. 52, 63 (1997) (upholding RICO conspiracy provision despite lack of overt act requirement).

[25] *United States v. Jones*, 733 F.3d 574, 584 (5th Cir. 2013).

[26] Section 1349 appeared as § 902 in the Act. *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 902, 116 Stat. 745, 805.

[27] *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 901, 116 Stat. 745, 804.

[28] *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("We also note that the title of a statue and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (citations omitted) (internal quotation marks omitted).

No. 12-41297

Section 1349 is clearly a freestanding criminal charge. The Andersons' contention that the district court erred by not dismissing the indictment fails.

## IV

The Andersons argue that the district court erred by admitting into evidence the Maryland Securities Board Cease and Desist Order in violation of Federal Rule of Evidence 404(b).

The Cease and Desist Order was submitted as the Government's Exhibit 127. The Order alleges that in July 2007, Norman Anderson solicited money from a Maryland resident and promised to pay back the principal and a substantial amount of interest in a short period of time. Even though the investor got back some money, he never got back the full promised amount.

We review the admission of evidence under Rule 404(b) under a "heightened" abuse of discretion standard.[29] "[E]vidence in criminal trials must be 'strictly relevant to the particular offense charged.'"[30] But even if the district court abuses its discretion, we do not reverse if the error was harmless.[31] An error is considered harmless when it does not affect the substantial rights of the defendant, but the government has the burden of establishing such harmlessness beyond a reasonable doubt.[32]

Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."[33] But such evidence may be admissible for another purpose, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

---

[29] *United States v. Templeton*, 624 F.3d 215, 221 (5th Cir. 2010)

[30] *United States v. Hays*, 872 F.2d 582, 587 (5th Cir. 1989) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

[31] *United States v. Jackson*, 339 F.3d 349, 354 (5th Cir. 2003).

[32] *United States v. McCall*, 553 F.3d 821, 827 (5th Cir. 2008).

[33] Fed. R. Evid. 404(b).

mistake, or lack of accident."[34]

Under *United States v. Beechum*,[35] we engage in a two-step process in analyzing whether extrinsic evidence was admissible. "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character."[36] "Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [Federal Rule of Evidence] 403."[37]

As to the first step of *Beechum*, both conspiracy and the substantive charge of wire fraud require the government to prove intent,[38] and for the conspiracy charge the government also has to prove knowledge.[39] By pleading not guilty and requiring the Government to prove the elements of its case, the Andersons made evidence of their intent and knowledge relevant.[40] The Cease and Desist Order surely goes to their intent to defraud and knowledge of the unlawfulness of the conspiracy, which are issues other than character.

However, the Government's contention that this evidence was relevant as to absence of mistake or lack of accident is problematic. From the record, it does not appear that the Andersons claimed that they accidentally or mistakenly committed wire fraud or conspired to commit wire fraud. "[A]bsence of mistake or accident need not be proved by the government unless raised by the defense."[41] Therefore, this extrinsic evidence could not have been

---

[34] *Id.*

[35] 582 F.2d 898 (5th Cir. 1978) (en banc).

[36] *Id.* at 911.

[37] *Id.*

[38] *Brooks*, 681 F.3d at 699–700 (explaining that conspiracy has two intent requirements "intent to further the unlawful purpose and the level of intent required for proving the underlying substantive offense," and that the offense of wire fraud, which is the underlying substantive offense here, "requires the specific intent to defraud").

[39] *Grant*, 683 F.3d at 643.

[40] *See McCall*, 553 F.3d at 828.

[41] *Id.*

admissible to show absence of mistake or lack of accident.

As to the second step of *Beechum*, the Cease and Desist Order does not present a problem. There was extensive evidence from victims about how much money they had lost and the operations of the scheme. Given this evidence, the probative value of the Order was not substantially outweighed by unfair prejudice or any other Rule 403 dangers. The district court did not err in admitting the Order.

## V

The Andersons argue that the district court erred by admitting into evidence the testimony of those victims who were not named in the indictment: Peter Palmer, Don Henriques, Danta Mason, Rafael Green, Andrew Anderson, Phillip Douglas, and Deborah Ford.

Before getting to the Rule 404(b) inquiry, it is important to examine whether this evidence is even extrinsic, because "[i]nstrinsic evidence is generally admissible, and its admission is not subject to" Rule 404(b).[42] "Evidence of an uncharged offense arising out of the same transactions as the offenses charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b), and is therefore not barred by the [R]ule."[43] Evidence is intrinsic "when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged."[44]

Here, the Government contends that this evidence is intrinsic because the victims who were not named in the indictment were part and parcel of the same conspiracy and scheme, and this evidence allowed the jury to consider all

---

[42] *United States v. Freeman*, 434 F.3d 369, 374 (5th Cir. 2005).

[43] *United States v. Maceo*, 947 F.2d 1191, 1199 (5th Cir. 1991).

[44] *Freeman*, 434 F.3d at 374 (quoting *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990)) (internal quotation marks omitted).

No. 12-41297

the circumstances of the crimes. For example, Peter Palmer (an unnamed victim) referred the Parrishes (named victims) to the Andersons. Similarly, when Jan Desper (a named victim) "started getting nervous" she reached out to Danta Mason (an unnamed victim): "[W]e would talk, and I would just share notes with her as to whether or not you're getting your money back, how easy are you getting your money back." Such connections between the named and unnamed victims show that the evidence of the other act is inextricably intertwined with the charged crime. In *United States v. Freeman*,[45] we held that evidence of an uncharged Ponzi scheme was intrinsic to the charged Ponzi scheme because the "uncharged offense arose out of the same series of transactions, because the funds were co-mingled and used to make lulling payments to investors from both schemes."[46] We find similar inextricable intertwinement here.

Even if this were extrinsic evidence, it would still be admissible through Rule 404(b). This evidence would go to prove intent and knowledge (as discussed with the Cease and Desist Order). Finally, we find that the probative value of this evidence was not substantially outweighed by its prejudicial effect or any other Rule 403 dangers. The district court did not err in admitting this evidence.

## VI

The Andersons contend that the district court erred in calculating the number of victims, and thus in imposing the 2-level increase under U.S.S.G. § 2B1.1(b)(2)(A)(i).

We review a district court's interpretation or application of the Sentencing Guidelines de novo and its factual findings for clear error.[47] No

---

[45] 434 F.3d 369 (5th Cir. 2005).

[46] *Id.* at 374.

[47] *United States v. Trujillo*, 502 F.3d 353, 356 (5th Cir. 2007).

clear error has occurred if the district court's finding is plausible in light of the record as a whole.[48]

Under § 2B1.1(b)(2)(A)(i), if the offense involved 10 or more victims, the offense level is increased by two levels.[49] The commentary to § 2B1.1 defines "victim" as, among other things, "any person who sustained any part of the actual loss."[50] "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."[51]

The Andersons contend that there were just 9, not 11, victims because Phillip Douglas collected and combined his investments with those of two others investors, his former girlfriend Deborah Ford and his friend Derek Bailey. Since the Andersons returned more money to Douglas than he put in, the Andersons contend that Ford and Bailey do not count as victims because that extra money was really directed at Ford and Bailey.

At the sentencing hearing, the district court rejected this argument, saying "I think that the number of victims was at least 10 and probably 11." First, the district court found that neither Ford nor Bailey got their money back. Second, even if Bailey had pooled his money with Douglas, the district court found that Ford had not done so and could be counted as a separate victim: "[S]he didn't get paid back because they didn't pay people back."

This factual finding is clearly plausible in light of the record as a whole. On the one hand, Phillip Douglas testified at trial that at some point he was "forced to be the go-to person" between the Andersons and Ford and Bailey, and therefore accepted payments on their behalf from the Andersons. But he also testified that the Andersons never gave him instructions on how to divide

---

[48] *United States v. Harris*, 597 F.3d 242, 250 (5th Cir. 2010).
[49] U.S. Sentencing Guidelines Manual § 2B1.1(b)(2)(A)(i) (2012).
[50] *Id.* § 2B1.1 cmt. n.1.
[51] *Id.* § 2B1.1 cmt. n.3(A)(i).

15

No. 12-41297

up the money he received as returns from them. On the other hand, Ford transmitted money directly to the Andersons. And she testified that while she gave about $10,000, she got back about $6,000. The district court did not clearly err in finding that Ford was a victim who suffered actual loss. Furthermore, while Bailey did pool his investment and gave his share of $15,000 to the Anderson via Douglas, he never got any money back. During the sentencing hearing, Special Agent Nicoll testified that "while the funds given to the Andersons between Mr. Bailey and Mr. Douglas were intermingled, the actual returns were not clear as to what money would be going where and Mrs. Ford had direct dealings." Thus, the district court would not have clearly erred had it found Bailey was a victim as well.

The district court did not clearly err in finding that there were at least 10 victims, justifying the § 2B1.1(b)(2)(A)(i) enhancement.

**VII**

The Andersons argue that the district court imposed a substantively unreasonable sentence under 18 U.S.C. § 3553(a).

It is well settled that the Sentencing Guidelines are advisory,[52] and sentencing decisions are examined for reasonableness.[53] Because the Andersons did not challenge the reasonableness of their sentence at the district court level, we review for plain error.[54] Under plain error review, the sentencing decision can be corrected only if "(1) there is error (and in light of *Booker*, an 'unreasonable' sentence equates to a finding of error); (2) it is plain; and (3) it affects substantial rights.[55] Even with a finding of all three prongs, Federal Rule of Criminal Procedure 52(b) "leaves the decision to correct the

---

[52] *United States v. Booker*, 543 U.S. 220, 245 (2005).

[53] *Gall v. United States*, 552 U.S. 38, 45–46 (2007).

[54] *United States v. Peltier*, 505 F.3d 389, 391–92 (5th Cir. 2007).

[55] *Id.* at 392.

forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings."[56]

"Properly calculated within-Guidelines sentences enjoy a presumption of reasonableness that is rebutted only upon a showing that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors."[57] When a district court imposes a within-Guidelines sentence, we "infer that the judge has considered all the factors for a fair sentence . . . , and it will be rare for a reviewing court to say such a sentence is 'unreasonable.'"[58]

Here, the district court sentenced the Andersons to 57 months in prison, a within-Guidelines sentence. The district court correctly noted that the Sentencing Guidelines are advisory. And it stated that "[t]he court has fully considered the U.S. Sentencing Guidelines as well as provision of [18 U.S.C. § 3553(a)] in determining an appropriate sentence for these defendants." The district court noted that it found the sentences reasonable "in view of the nature and circumstances of the offense." As to both sentences, the court found that they would "serve as just punishment, promote respect for the law, and deter future violations of the law." Given the within-Guidelines sentences and the district court's consideration of § 3553(a), the Andersons have not overcome the presumption of reasonableness. The sentences imposed were reasonable,

---

[56] *United States v. Olano*, 507 U.S. 725, 732 (1993) (citations omitted) (internal quotation marks omitted).

[57] *United States v. Brown*, 727 F.3d 329, 342 (5th Cir. 2013) (citation omitted) (internal quotation marks omitted). The Andersons also take issue with this presumption, arguing that within-Guidelines sentences should not be presumed to be reasonable. However, this argument is clearly foreclosed by our precedent.

[58] *United States v. Smith*, 440 F.3d 704, 707 (5th Cir. 2006) (quoting *United States v. Mares*, 402 F.3d 511, 519 (5th Cir. 2005)).

No. 12-41297

and the district court did not commit plain error.

## VIII

For the foregoing reasons, all of the Andersons challenges to their convictions and sentences fail. The district court is AFFIRMED.